UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KIMMY M. RAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:17-CV-2908-SPM |
| | ) |
| | ) |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Deputy Commissioner of Operations, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Defendant Nancy A. Berryhill, Deputy Commissioner for Operations, Social Security Administration (the "Commissioner") denying the application of Plaintiff Kimmy M. Ray ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 8). Because I find the decision denying benefits was not supported by substantial evidence, I will reverse the Commissioner's denial of Plaintiff's application and remand the case for further proceedings.

**I.     PROCEDURAL BACKGROUND**

In July 2014, Plaintiff applied for DIB and SSI, alleging that she had been unable to work since March 19, 2014. (Tr. 196-208). Her application was initially denied. (Tr. 137). On November

1

5, 2014, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ) (Tr. 144, 146). On September 13, 2016, the ALJ held a hearing. (Tr. 38-71). On January 12, 2017, the ALJ issued an unfavorable decision, finding Plaintiff not disabled. (Tr. 16-37). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council, and on November 6, 2017, the Appeals Council denied the request for review (Tr. 1-3). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II. FACTUAL BACKGROUND[1]

Plaintiff testified at the hearing before the ALJ as follows. Plaintiff was born on June 25, 1964. (Tr. 45-46). She finished the eleventh grade, after being "put out of the school" for behavioral problems. (Tr. 46). She does not think she was in special education. (Tr. 46). She last worked in May of 2011, putting bottles on an assembly line. (Tr. 46). She has also worked doing child care in her home and in a day care. (Tr. 46, 62, 64-65).

Plaintiff lives with a boyfriend, who does the shopping, cooking, and household chores; she watches TV or lies around. (Tr. 50). She sometimes goes to the grocery store with him. (Tr. 56). She writes down a grocery list, but he helps her with how to spell things. (Tr. 56). Her boyfriend will make her a plate of food and put it in the microwave so that she just has to push the button. (Tr. 54-55). She could not read the instructions on a box of macaroni and cheese, and she would not be able to read a newspaper article. (Tr. 55). She has a cell phone but does not text. (Tr. 51-52). She cannot focus on a 30-minute television show from beginning to end. (Tr. 53). She has children and grandchildren; she talks on the phone with them, and they stop by to see her once or

---

[1] Because Plaintiff's arguments are directed entirely toward the ALJ's finding regarding Plaintiff's cognitive impairment, the Court focuses its discussion of the facts relevant to that impairment and related limitations.

twice a month. (Tr. 51). She has three or four friends who come to visit her about three or four times a month; they sit around and talk. (Tr. 56).

Plaintiff has been having hallucinations for three of four years in which she sees dead people and hears voices. (Tr. 47-48, 53). She does not sleep well at night, and takes naps during the day. (Tr. 53). She gets angry a lot, and when that happens she shuts the door, goes into her room, and starts crying. (Tr. 57). That happens about four days a week. (Tr. 57).

In her Function Report, Plaintiff reported that she forgets a lot of things. (Tr. 261). She does not drive but does shop, and she is able to pay bills and count change. (Tr. 263). Her hobbies are reading and watching television, but when reading she does not understand some words. (Tr. 264). She reported problems with memory, concentration, and understanding. (Tr. 265).

Plaintiff's boyfriend completed a Third Party Function Report. In addition to physical issues, he reported that Plaintiff does not go out alone because she believes someone will hurt her, that she is not able to pay bills and does not have a checking account, and that she reads some things she does not understand. (Tr. 274-75). He reported that she does not follow written instructions well because she has problems reading things, and that she understands some spoken instructions but not all the time. (Tr. 276).

Plaintiff's school records show that her IQ was recorded as 68 in 1971, as 66 (non-verbal) and 78 (verbal) in 1974, and as 71 in 1977. (Tr. 301). Plaintiff's high school records show that in ninth grade, she received five "F" grades, two "D" grades, and one "C" grade; in tenth grade, she received four "F" grades and two "W" grades (for "withdrawn"). She had a cumulative GPA of 0.200 by the second semester of her sophomore year. (Tr. 304, 306). There is no record of her completing or passing any courses after ninth grade.

Following a disability field office interview, the agency representative noted that it was difficult to understand Plaintiff, as she did not speak clearly. (Tr. 229).

On September 29, 2014, Plaintiff underwent a consultative examination by licensed psychologist Sherman Sklar, M.E. Mr. Sklar noted that Plaintiff "appeare[ed] to have a low IQ." (Tr. 351). He noted that Plaintiff "spoke in an unclear manner and spoke rapidly, so it was a little difficult to understand her, but she was able to make herself understood." (Tr. 349). He reported that she cried at several points during the examination and related being called, "slow, dumb, and stupid." (Tr. 349). Her chief complaints were depression and hearing voices. (Tr. 349). He noted that she described difficulties in school related to her being "slow," and she said her peers called her names like "stupid and midget." (Tr. 350). She also said that others had called her "dumb, stupid, and slow." (Tr. 350). She reported fights with other children in high school. (Tr. 350). She reported spending most of her days lying on the couch watching television, reading, and sometimes going to the grocery store. (Tr. 350). She said it was hard for her to read. (Tr. 350). She reported depression, sadness, and crying. (Tr. 350). There were no signs of a thought disorder in terms of tangentiality, flight of ideas, or perseveration. (Tr. 351). Her responses to cognitive questions showed "some deficits in her social judgment, her calculation abilities and abstract reasoning abilities." (Tr. 352). There were no obvious deficits in her ability to focus. (Tr. 352). She was diagnosed with depressive disorder. (Tr. 353).

On October 29, 2014, Sherry Bassey, Ph.D., reviewed the records and noted that although a consultative examiner had noted that Plaintiff "appeared to have a low IQ," the totality of the evidence suggested that Plaintiff had the capacity to perform simple work. (Tr. 112-13).

Plaintiff saw a psychiatrist several times in 2015 and 2016. The written notes are largely illegible, but mental status examinations show that Plaintiff generally had an anxious and/or

4

depressed mood and affect, borderline intellect, difficulties with recent memory, limited concentration, a guarded insight/judgment, and logical thought processes, and sometimes had slurred speech or "poverty of speech."(Tr. 646-658).

On February 24, 2015, Plaintiff saw Thomas Spencer, Psy.D., for a psychological evaluation. (Tr. 662-65). Plaintiff reported that she had been an average student, denied habitual trouble at school, and stated that she planned to enroll in GED classes. (Tr. 663). Her speech was within normal limits, her insight/judgment seemed intact, and her affect was neutral. (Tr. 664). In a test of recent recall, she was able to recall zero out of three objects. (Tr. 664). In tests of attention and concentration and fund of information, she had some deficiencies. (Tr. 664-65). Dr. Spencer diagnosed generalized anxiety disorder and depressive disorder. (Tr. 665). He stated that it was his opinion that Plaintiff had "a mental illness that appears to interfere with her present ability to engage in employment suitable for her age, training, experience, and/or education" and that "the duration of the disability could exceed 12 months, but with appropriate treatment and compliance, prognosis improves." (Tr. 665).

On December 9, 2016, Plaintiff underwent a psychological evaluation by Dr. Alan J. Politte. (Tr. 669-72). Dr. Politte noted that she had an agreeable attitude, a dull facial expression, and poor eye contact. (Tr. 669). He noted that her responses, although difficult to hear and understand, were coherent, relevant, and logical, and that she stayed focused on the questions given to her. (Tr. 669). Dr. Politte administered the Weschler Adult Intelligence Scale IV (WAIS-IV), the Comprehensive Trail-Making Test, and the Weschler Memory Scale IV. (Tr. 670). Her verbal comprehension score was 63, her perceptual reasoning score was 60, her working memory score was 63, her processing speed was 65, and her full scale IQ was 57. (Tr. 670). Her percentile scores for the WAIS-IV ranged from 0.2 to the 1st percentile. She was noted to be functioning at the low

end of the mild mental retardation range. (Tr. 670). On the comprehensive trail-making test, her scores ranged from severely impaired to average. (Tr. 671). On the memory scale test, she scored "extremely low" in every area tested (auditory memory, visual memory, visual working memory, immediate memory, and delayed memory). (Tr. 671).

### III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is

"any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e), 416.945(a)(1). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff has not engaged in substantial gainful activity since March 19, 2014, the alleged onset date; that Plaintiff had the severe impairments of minimal degenerative changes of the lumbar spine with lumbago, borderline intellectual functioning, depression, generalized anxiety disorder, and post-traumatic stress disorder; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 21-22). The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that she must never climb ladders, ropes, or scaffolds and is capable of performing simple, one-to-two-step tasks in an environment where there are only occasional work place changes and where contact with supervisors, co-workers or the general public is occasional. (Tr. 23). At Step Four, the ALJ found Plaintiff unable to perform any past relevant work. (Tr. 31). At Step Five, relying on the testimony of a vocational expert, the ALJ found Plaintiff capable of performing other jobs existing in significant numbers in the national economy, including bottling line attendant (*Dictionary of Occupational Titles* No. 920.687-042), folding machine operator (*Dictionary of Occupational Titles* No. 208.685-014), and production line sorter (*Dictionary of Occupational Titles* No. 813.684-022). (Tr. 32). Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

## V. DISCUSSION

Plaintiff argues that this case should be reversed and remanded due to errors in the ALJ's analysis at Step Three of whether Plaintiff met or equaled Listing 12.05.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Step Three Analysis

Plaintiff argues that this case must be reversed and remanded because the ALJ erred in her analysis at Step Three of whether Plaintiff met or equaled listing 12.05. Specifically, Plaintiff

argues that the ALJ erred by requiring that all of the requirements of the listing be satisfied before Plaintiff was age 22, by incorrectly evaluating the facts of Plaintiff's activities of daily living, by focusing too much on Plaintiff's adaptive strengths rather than her deficits, and by failing to obtain evidence regarding whether Plaintiff equaled Listing 12.05.

The Listing of Impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (the "Listings") "describes for each of the major body systems impairments that [the Commissioner] considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). "The claimant has the burden of proving that his impairment meets or equals a listing." *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010). "To meet a listing, an impairment must meet all of the listing's specified criteria." *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

At the time of the ALJ's decision, Listing 12.05 read as follows:[2]

> 12.05 **Intellectual Disability**: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> > The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> >
> > A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; [OR]
> >
> > B. A valid verbal, performance, or full scale IQ of 59 or less; [OR]

---

[2] Effective January 17, 2017, Listing 12.05 was amended. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 43048, 2016 WL 5341732 (Sept. 26, 2016). The Court applies the version of Listing 12.05 that applied at the time of the ALJ's decision. *See id.* at n.1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; [OR]

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.05. The Eighth Circuit has held that "the requirements in the introductory paragraph are mandatory." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006). Thus, "[t]o meet the requirements of Listing 12.05, a claimant must demonstrate that she suffers from deficits in adaptive functioning that initially manifested during the developmental period." *Ash v. Colvin*, 812 F.3d 686, 690 (8th Cir. 2016) (citing *Maresh*, 438 F.3d at 899).

The ALJ found that Plaintiff's impairments did not meet or equal in severity any of the listed impairments. (Tr. 22-23, 25). The ALJ noted that in 1971, 1974, and 1977 (when Plaintiff was age 7 to 13), the record contained IQ scores ranging from 68 to 78. (Tr. 25). The ALJ then noted that in December 2016, Plaintiff was found to have a verbal comprehension score of 63, a perceptual reasoning score of 60, a working memory score of 63, a processing speed score of 65, and a full-scale IQ score of 57. (Tr. 25). After describing these scores, the ALJ stated, "However, the claimant's work history indicates no significant intellectual deficits." (Tr. 25). The ALJ also noted that Plaintiff had not received special education services for a learning disability; that Plaintiff had testified she was "put out of school" because of behavior; that Plaintiff had worked as a self-employed child caregiver; that Plaintiff babysat three of her grandchildren; and that Plaintiff reads, is able to prepare simple microwave meals, clean, go grocery shopping, spend time

with others, use the computer for twenty minutes at a time, and use a cell phone. (Tr. 25). The ALJ further stated:

> As for meeting the criteria of Listing 12.05, prior to age 22, and thereafter, the claimant was able to complete IQ testing and she is not dependent upon others for personal needs due to a mental impairment. Prior to age 22, she did not have a valid verbal, performance, or full-scale IQ of 59 or less. Prior to age 22, she did not have a valid verbal, performance or full-scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function or marked restriction or difficulties in activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace or repeated episodes of decompensation. Thus, I find that her IQ scores support a finding that her borderline intellectual functioning is severe, and as noted above, she is limited beyond simple one-two step tasks with limited work place changes and limited contact with others. The claimant failed her burden to prove more restrictive limitations of functioning because of an intellectual impairment.

(Tr. 26).

Plaintiff argues that the ALJ's analysis of Listing 12.05 was based on a legal error: the ALJ apparently believed that to establish Listing 12.05, Plaintiff had to show that all of the requirements of Listing 12.05 existed prior to age 22, when in actuality it is only the requirements of the introductory paragraph that must have existed prior to age 22. The Court agrees. The ALJ's wording suggests, for example, that she might have found that Plaintiff did not meet Listing 12.05(C) because Plaintiff had did not show a "physical or other mental impairment imposing an additional and significant work-related limitation of function" that arose before age 22. In addition, the ALJ's wording suggests that she may have believed that Plaintiff could not meet Listing 12.05(B) or Listing 12.05(C) because she did not have a valid IQ test *performed* prior to age 22 that showed an IQ in the Listing range. That is not the case. It is well-established that an IQ score obtained after the developmental period may satisfy the Listing's requirement, because a person's IQ scores are generally presumed to remain stable over time. *See Maresh*, 438 F.3d at 899 (relying on IQ score obtained at age 37, combined with evidence of difficulty with school performance and

fighting with other children, to find Listing 12.05(C) was satisfied) (citing *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001)); *Muncy*, 247 F.3d at 734 ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.").

The ALJ also did not make it clear in her decision which of the criteria of Listing 12.05 she found were not met or why they were not met. She did not make any express findings regarding whether Plaintiff had deficits in adaptive functioning manifested prior to age 22; did not make any express findings regarding which (if any) of the IQ scores in the record she found valid; and did not make any express findings regarding whether Plaintiff had "a physical or other mental impairment imposing an additional and significant work-related limitation of function" that would help satisfy Listing 12.05(C).

The Court recognizes that these deficiencies in the ALJ's analysis, standing alone, do not necessarily require remand. The Eighth Circuit has "consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case." *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999). However, remand is warranted "where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision." *Scott v. Astrue*, 529 F.3d 818, 822-23 (8th Cir. 2008) (finding remand was required for further consideration of Listing 112.05D where the record contained contradictions related to intellectual functioning, adaptive functioning, and IQ scores that the ALJ failed to resolve). *See also Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) (remanding for further consideration and findings with regard to Listing 12.05(C) where the ALJ did not address Listing 12.05(C) and where, after review of the record, the court could not conclude

that the ALJ's decision was supported by substantial evidence on the record as a whole); *Pettit v. Apfel*, 218 F.3d 901, 903-04 (8th Cir. 2000) (remanding for further consideration "because the ALJ's factual findings are insufficient for [the court's] review").

After review of the record, the Court finds that the ALJ's findings, viewed in light of the record as a whole, are insufficient to permit the Court to conclude that substantial evidence supports the Commissioner's decision that Plaintiff does not meet or equal Listing 12.05. It appears from the record that each of the criteria of Listing 12.05(B) or Listing 12.05(C) is, or at least may be, satisfied here.

First, Plaintiff's IQ test showed that Plaintiff has a full-scale IQ of 57—a score within the range described in Listing 12.05(B), and below the range described in Listing 12.05(C). The consultative examiner who conducted the IQ testing did not question the validity of the results and noted that Plaintiff stayed focused on the questions given to her. (Tr. 669-72). The ALJ did not discuss whether she found this score to be valid, nor did she identify any reasons for finding it to be invalid. As discussed above, to the extent that the ALJ disregarded this IQ score simply because it was obtained after the age of twenty-two, that was improper. because "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." *Maresh*, 438 F.3d at 900 (quoting *Muncy*, 247 F.3d at 734).[3] The Court recognizes that an ALJ "is not required to accept a claimant's I.Q. scores" and "may reject scores that are inconsistent with the record," especially when the scores are based on a one-time examination by

---

[3] This is not necessarily the case for IQ scores obtained prior to age sixteen. The regulations recognize that "[g]enerally, the results of IQ tests tend to stabilize by the age of 16," and the provide that "IQ test results obtained between ages 7 and 16 should be considered current for . . . 2 years when the IQ is 40 or above." 20 C.F.R. Pt. 404, Subpt. P, § 112.05c(10)). *Accord Woods v. Colvin*, No. 11-4363-CV-C-REL-SSA, 2013 WL 683620, at *10 (W.D. Mo. Feb. 25, 2013).

a nontreating psychologist. *See Clark v. Apfel,* 141 F.3d 1253, 1255-56 (8th Cir. 1998). In this case, however, the ALJ did not explicitly reject the IQ scores in the record and did not give any reasons for finding them invalid.

Second, it is clear that the Listing 12.05(C) requirement of "a physical or other mental impairment imposing an additional and significant work-related limitation of function" is also satisfied. The ALJ found Plaintiff to have severe impairments of lumbago, depression, generalized anxiety disorder, and post-traumatic stress disorder, and she included limitations in the RFC reflecting those impairments. (Tr. 23).

Third, it appears that the record may support a finding that Plaintiff satisfies the introductory paragraph's requirement of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." The Social Security regulations do not define the phrase "deficits in adaptive functioning" and do not further explain what is required to show that the introductory paragraph of Listing 12.05 is satisfied. However, the Eighth Circuit has found several factors to be relevant, including whether a claimant was able to complete high school; whether a claimant has difficulties in reading and writing; whether a claimant needed special education services; whether a claimant has exhibited behavioral problems; how well a claimant is able to communicate; whether a claimant has been able to perform work (especially skilled or semi-skilled work); and whether a claimant has been able to perform activities of daily living independently. *See, e.g.*, *Scott v. Berryhill*, 855 F.3d 853, 856-57 (8th Cir. 2017) (discussing special education classes, failure to complete high school, history of unskilled and semi-skilled work, reading ability, communication ability, and ability to perform daily activities); *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007) (discussing "low-grade dropout"

and participation in prior special education classes); *Maresh*, 438 F.3d at 900 (discussing frequent fights with other children, struggling in special education classes, dropping out of school in the ninth grade, and having trouble with reading, writing, and math); *Lott v. Colvin*, 772 F.3d 546, 550 (8th Cir. 2014) (discussing special education classes, failure to complete high school, and violent altercations).

Defendant argues that "[r]egardless of the ALJ's bases of Plaintiff's failure to meet the listing, substantial evidence supports the denial of benefits" because "there is simply no evidence that she fully satisfies the Listing because she has not met the requirements of the introductory paragraph." Def's Br., at 5. The Court disagrees. A review of the record in light of the relevant factors reveals conflicting evidence, some of it supportive of a finding of deficits in adaptive functioning.

Plaintiff's school records—which were not discussed by the ALJ—show that her school performance was extremely poor. In ninth grade, she received five "F" grades, two "D" grades, and one "C" grade; in tenth grade, she received four "F" grades and two "W" grades (for "withdrawn"). She had a cumulative GPA of 0.200 by the second semester of her sophomore year. (Tr. 304, 306). Plaintiff's childhood IQ scores between 68 and 78, though of limited value because they were obtained prior to age sixteen and therefore were valid for only two years, also support a conclusion that Plaintiff had some cognitive impairment that arose prior to age 22. In addition, Plaintiff reported that she was "put out" of school for fighting, which is indicative of deficits in adaptive functioning. *See Maresh*, 438 F.3d at 900 (considering "frequent fights with other children" to be evidence of "deficits in adaptive functioning at a young age"). She also reported to the consultative examiner that she had difficulties in school related to being "slow," and that her peers called her "stupid." (Tr. 350). The record also contains evidence that Plaintiff has difficulty

16

communicating. An agency field representative found her difficult to understand (Tr. 229), and her treating psychiatrist often noted that she had slurred speech or "poverty of speech." (Tr. 646-658). The consultative examiner stated that although she was able to make herself understood, she "spoke in an unclear manner," so it was a little difficult to understand her. (Tr. 349). Plaintiff also reported significant difficulties in her ability to read. (Tr. 55, 64).

Defendant argues that facts such as Plaintiff's ability to work as a child care worker, as well as her ability to perform activities of daily living, show that she does not have deficits in adaptive functioning. These factors certainly weigh against a finding of deficits in adaptive functioning. *See, e.g., Cheatum v. Astrue*, 388 F. App'x. at 574, 576-77 (8th Cir. 2010) (ability to maintain employment in semi-skilled and unskilled positions for many years and to perform activities of daily living supported a finding that the claimant had failed to establish the deficits in adaptive functioning required to meet Listing 12.05). However, the Eighth Circuit has cautioned against over-reliance on the ability to perform work and basic activities of daily living in finding Listing 12.05(C) not met. In adopting the argument of a plaintiff that the ALJ had improperly relied on Plaintiff's account of his functioning and his ability to work in mainstream jobs to find Listing 12.05(C) not satisfied, the Eighth Circuit stated:

> The ALJ's reasoning, if accepted, would make it practically impossible for noninstitutionalized mentally-retarded claimants to meet listing 12.05C because ALJs will nearly always be able to point to the performance of rudimentary activities of daily living—even though such activities do not, in fact, show that a person is not mentally retarded. . . . Listing 12.05C assumes that the mildly-retarded can work if their only impairment is mild mental retardation. Disability is based on mild mental retardation plus an additional physical or mental impairment that imposes a significant limitation on a person's ability to work.

*Lott*, 772 F.3d at 551. Plaintiff's past ability to work and her ability to perform daily activities must be weighed against all of the other evidence relevant to deficits in adaptive functioning, and it is not apparent to the Court whether the ALJ properly weighed that evidence.

17

In sum, the record contains significant conflicting evidence in the record regarding whether Plaintiff had deficits in adaptive functioning sufficient to satisfy the introductory paragraph of Listing 12.05. In light of this conflicting evidence, combined with the absence of a finding from the ALJ regarding whether Plaintiff satisfied the introductory paragraph of Listing 12.05 and the ambiguities in the ALJ's decision regarding the reasons why the ALJ found Listing 12.05 was not satisfied, the Court is unable to determine that substantial evidence supports the finding that Listing 12.05 is not satisfied. Accordingly, the Court will remand the case to the Commissioner for further consideration of Listing 12.05.

### VI. CONCLUSION

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under 42 U.S.C. § 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of March, 2019.